IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEBRA STEPHENS,             )     CV. NO. 1:12-CV-659-DAE

                              )

           Plaintiff,     )

                              )

vs.                        )

                              )

THE CITY OF AUSTIN and    )

ART ACEVEDO,            )

                              )

           Defendants.    )

_____ )

ORDER: (1) DENYING PLAINTIFF'S OBJECTIONS TO REPORT AND
RECOMMENDATION; (2) ADOPTING IN PART AND VACATING IN PART
<u>REPORT AND RECOMMENDATION</u>

On June 26, 2014, the Court heard oral argument on the Objections to

Magistrate Judge Mark Lane's Report and Recommendation filed by Plaintiff

Debra Stephens (hereinafter "Plaintiff" or "Stephens").  ("Obj.," Dkt. # 70.)

Andrew Skemp, Esq., appeared at the hearing on behalf of Stephens; Misell B.

Kneeland, Esq., appeared on behalf of Defendants City of Austin and Art Acevedo

(collectively, "Defendants").  After careful consideration of the arguments

presented at the hearing, as well as the supporting and opposing memoranda, the

Court **DENIES** Stephens's Objections and **ADOPTS IN PART AND VACATES**

**IN PART** the Magistrate Judge's Report and Recommendation.

1

<u>BACKGROUND</u>

I.     <u>Factual Background</u>

Stephens began working as a senior chemist for Austin Police Department's ("APD") Forensic Lab ("Lab") in 2002.  (Dkt. # 55 ("Mot."), Ex. J ("Stephens Dep.") at 19–20; Mot., Ex. C ("Harris Decl.") ¶ 14; Dkt. # 62 ("Resp."), Ex. 8 ("Stephens Aff.") ¶ 1.)  Her initial job duties included blood alcohol testing and drug analysis.  (Stephens Dep. at 28.)  At the time she began her employment with APD, Stephens was certified as a Technical Breath Test Supervisor.  In 2006, she assumed responsibility for running the breath alcohol testing program; she continued to perform blood alcohol testing and drug analysis, and additionally began testifying in court regarding her work.  (Stephens Dep. at 29; Mot., Ex. F ("Rodriguez Decl.") ¶ 7; Stephens Aff. ¶ 1.)

In 2007, Stephens applied for the newly created Lab position of Quality Assurance Manager, as well as for the positions of Chemistry Section Manager and Forensic Chemistry Section Supervisor.  Stephens was not hired for any of these positions.  Instead, Gloria Rodriguez ("Rodriguez") was promoted to Forensic Chemistry Section Supervisor, and Stephens began reporting to her. (Harris Decl. ¶ 15; Rodriguez Decl. ¶ 4; Stephens Aff. ¶¶ 2–3.)

In 2010 and 2011, William Gibbens ("Gibbens"), the Forensic Science Division Manager, supervised Rodriguez.  Gibbons reported to Ed Harris

("Harris"), Chief of Field Support Services. Harris reported to Assistant Chief Sean Mannix ("Mannix"), who in turn reported to Chief Acevedo ("Acevedo"). (Harris Decl. ¶¶ 9–10; Stephens Aff. ¶ 4.) Only Acevedo had the authority to terminate an employee, but he relied heavily on the information provided to him by his Assistant Chiefs in making his decisions. (Mot., Ex. A ("Acevedo Decl.") ¶ 11; Mot., Ex. G ("Acevedo Dep.") at 129–30; Mot., Ex. D ("Mannix Decl.") ¶ 17.)

In October 2010, Stephens informed Rodriguez that an issue had arisen in a case in which she was to testify about a blood–alcohol analysis she performed. Stephens had accepted a phone call from the defense attorney in August 2009 and mistakenly reported to the defense attorney that the blood alcohol concentration level was under .08 (below the legal limit for intoxication). When Stephens subsequently drafted her report, she realized she had provided the results for a different sample. She notified the defense attorney of the correct result (a blood alcohol concentration of .14, above the legal limit) and provided counsel a copy of her report. (Rodriguez Decl. ¶ 9 & Ex. 1; Mot., Ex. B ("Gibbens Decl.") ¶ 9; Harris Decl. ¶¶ 16–17; Mannix Decl. ¶¶ 22–23; Acevedo Decl. ¶ 17; Stephens Aff. ¶ 5.)

Rodriguez and her supervisors believed the release of a non-final, non-reviewed result without a discovery order, subpoena, or open records request violated the Lab's standard operating procedures ("SOPs"). In addition, Rodriguez

3

was concerned because the case file did not contain any documentation of Stephens's conversations with defense counsel.  (Rodriguez Decl. ¶ 10; Gibbens Decl. ¶ 10; Harris Decl. ¶¶ 17–18; Mannix Decl. ¶ 24, 26; Acevedo Decl. ¶ 19.)

Further, Rodriguez was told by Stephens that the Assistant District Attorney ("ADA") prosecuting the case informed her that the DA's office had requested a copy of her Houston Police Department employment file. According to the ADA, defense counsel had claimed information in the file demonstrated Stephens had issues with documenting and handling evidence in Houston.  The ADA told Stephens he considered the information in her employment file to be "Brady" material which he would feel obligated to release to defense counsel in future cases.  (Rodriguez Decl. ¶ 11; Mot., Exs. 1–2; Gibbens Decl. ¶ 9; Harris Decl. ¶ 19; Mannix Decl. ¶ 25; Acevedo Decl. ¶ 18).  APD had not previously been aware of Stephens's improper disclosure of information in Houston.  (Harris Decl. ¶ 20).

Rodriguez reported the issues to Gibbens, who in turn spoke with Leticia Paredes ("Paredes"), APD's Human Resources ("HR") Manager.  Paredes advised Gibbens to proceed with a pre-termination hearing as she believed Stephens's improper release of results to be a terminable offense.  Gibbens discussed the matter with Harris and Mannix, who agreed that a pre-termination hearing was appropriate.  (Rodriguez Decl. ¶ 13 & Ex. 3; Gibbens Decl. ¶¶ 9, 11;

4

Harris Decl. ¶ 21; Mannix Decl. ¶ 26; Mot., Ex. E ("Paredes Decl.") ¶ 6).  On

November 4, 2010, pending an investigation and possible disciplinary actions,

Mannix, Gibbens and Harris decided Stephens's duties as a Breath Test Technical

Supervisor within the Lab should be taken away.  She was removed from working

on blood and breath alcohol testing and was restricted to drug testing.  (Harris

Decl. ¶ 22; Gibbens Decl. ¶ 12; Mannix Decl. ¶ 26; Stephens Aff. ¶ 5).

        Prior to the hearing, on November 12, 2010, Stephens sent an email to

approximately ninety-five forensic and legal colleagues.  The email states:

> I just wanted to inform all of you that I have been scheduled for a "pre-termination" hearing on Monday, November 15th, 2010 by Asst. Chief Sean Mannix.  I released the results of a blood alcohol case to defense attorney, Betty Blackwell, for one of her clients always believed that at the conclusion of my analysis that these results were a matter of public record, but my chain of command found an SOP which states that "all lab reports are confidential". I believe that the defense (an officer of the court) is entitled to this information, just as much as the prosecutor who gets the information automatically.

> I feel like I am up for the fight of my life . . . my career. I have been a forensic scientist for more than twenty years and I love my job!

> If you have an opportunity in the next couple of days to share a few words of support, I would greatly appreciate it.

(Stephens Dep. at 61; Resp., Ex. 3; Stephens Aff. ¶ 6).

        The pre-termination hearing was held on November 19, 2010.  At the

hearing, Stephens stated she was unaware of the APD policy providing that test

results were confidential and further that she believed such a policy would conflict

with state law. Rodriguez, in turn, explained that regardless of confidentiality, results were to be released in accordance with certain procedural requirements. Specifically, the analysis must be complete and reviewed, and a request in the form of subpoena, open records request, or discovery motion must be made before the information is released. (Rodriguez Decl. ¶ 15; Gibbens Decl. ¶ 13; Harris Decl. ¶ 23; Mannix Decl. ¶ 29).

At the hearing, Mannix found that Stephens had violated the SOPs and that the SOPs did not conflict with state law. Mannix concluded, in part because of Stephens's long tenure with the department and the quality of her substantive work, that Stephens should not be terminated but suspended for three days, placed on six months of disciplinary probation, and permanently removed from her responsibilities as a Breath Test Technical Supervisor. (Stephens Dep. at 147; Rodriguez Decl. ¶ 15; Gibbens Decl. ¶ 13; Harris Decl. ¶ 24; Mannix Decl. ¶¶ 28–29; Paredes Decl. ¶ 7; Stephens Aff. ¶ 6.)

On November 30, 2010, Stephens filed a grievance against APD, complaining that APD policy regarding dissemination of lab results violated Texas law and appealing her suspension. Rodriguez, as Stephens's supervisor, denied the grievance. Stephens appealed to Acevedo, who denied the appeal after reviewing the matter with Mannix. Stephens appealed Acevedo's rejection of her grievance to an outside hearing officer, pursuant to city policy. (Stephens Dep. at 74–75 &

Ex. 6; Paredes Decl. ¶¶ 8–10; Rodriguez Decl. ¶¶ 18–19; Mannix Decl. ¶¶ 34–37;

Acevedo Decl. ¶¶ 22–24; Acevedo Dep. at 125–31; Stephens Aff. ¶ 6.)

   In November 2010, Stephens sent a list of cases to APD HR

documenting instances where members of the Lab had released results of drug

analysis without conducting any actual testing.  The report was forwarded by APD

HR to Rodriguez in early December 2010 for explanation.  (Stephens Aff. ¶ 7;

Resp. Ex. 13 at COA 1532–34.)

   Harris asked Gibbens to keep him apprised of Stephens's conduct

during her probation.  Gibbens generally reviewed Stephens's conduct with Harris

verbally, but he did write two formal memos, one on February 18, 2011 and one on

April 10, 2011.  Gibbens also occasionally forwarded Harris emails relating to

Stephens.  (Gibbens Decl. ¶ 15; Mot., Exs. 1–2; Harris Decl. ¶ 34.)

   On November 19, 2010, Laura Carroll ("Carroll"), Stephens's

co-worker who had assumed Stephens's former responsibilities with blood alcohol

and breath testing, wrote a memo to Gibbens and Rodriguez expressing her

concerns about working with Stephens, stating Stephens was withholding

information and actively undermining her.  (Rodriguez Dep. 49–52 & Ex. 3;

Rodriguez Decl. ¶ 24; Gibbens Decl. ¶ 21.)  According to Rodriguez, on a regular

basis, Stephens expressed dissatisfaction with her duties, often yelling at other

employees and taking her frustrations out on them.  Some of the incidents were

7

documented by Stephens's co-workers, and some were reported to Paredes in HR. (Rodriguez Dep. at 13–16; Rodriguez Decl. ¶ 25; Paredes Decl. ¶¶ 15, 20.)

Rodriguez testified that she became aware that Stephens was attempting to remain certified as a Breath Test Technical Supervisor. Rodriguez was concerned that Stephens was using City time or resources to do so, despite having been stripped of breath test duties.  (Rodriguez Dep. at 186–87; Gibbens Dep. at 110–11; Rodriguez Decl. ¶¶ 26–27; Gibbens Decl. ¶ 23.)  Rodriguez gave Stephens a cease and desist memo on December 21, 2010, forbidding Stephens from using City time to retain her certification.  (Rodriguez Dep. at 186–88; Stephens Dep. at 190; Resp., Ex. 29; Rodriguez Decl. ¶ 27; Stephens Aff. ¶ 8.) According to Rodriguez and a co-worker Rodriguez asked to act as a witness, Stephens acted insubordinately—pointing her finger in Rodriguez's face, speaking loudly, calling Rodriguez "evil", and stating that she wished Rodriguez would "suffer."  (Rodriguez Decl. ¶ 28, Mot., Ex. 8; Paredes Decl. ¶ 15.)

According to Stephens, Rodriguez told her verbally that she would lose her certification.  (Stephens Dep. at 190–92.)  Stephens testified in her deposition that she said, "'Would you like to suffer like I'm suffering?'" (Stephens Dep. at 102–03).  In response to the question, "Did you call Gloria evil and say you hope she suffers like you have?"  Stephens testified, "I didn't ask that she suffer more than I suffered."  (Mot., Ex. L at 239).  Stephens states that she

reported to the City's HR that Rodriguez was harassing her and that it was improper to try to prevent her from maintaining her certification. The matter was turned over to APD HR in January 2011, and APD HR found Rodriguez had done nothing wrong. (Stephens Aff. ¶ 8.)

Harris learned of certain reported issues concerning Stephens's conduct. Because he was concerned about the effect her conduct might have on the operations and morale in the Lab, Harris raised these issues with Mannix and Paredes. Mannix directed Harris to have Gibbens and Rodriguez document Stephens's conduct and put her on notice that the conduct must be stopped. (Harris Decl. ¶¶ 35–37; Paredes Decl. ¶ 16; Mannix Decl. ¶ 41; Gibbens Decl. ¶ 24.)

On January 12, 2011, in the presence of her attorney, Stephens received a memo documenting a December 17, 2010 confrontation with another employee and the December 21, 2010 incident with Rodriguez. The memo referenced APD policies prohibiting unprofessional and insubordinate behavior and instructed Stephens to comply with those policies. (Rodriguez Decl. ¶ 29; Gibbens Decl. ¶ 25 & Ex. 2(F); Stephens Dep. at 98 & Ex. 8; Paredes Decl. ¶ 16.)

On February 8, 2011 Rodriguez issued Stephens a corrective action report relating to release of non-final drug analysis reports. Specifically, the report detailed that Stephens had released results to the investigator before the case was administratively reviewed. Although the analysis was determined to be correct

9

when it was reviewed, Stephens's early dissemination of the report violated the

Lab's SOPs. (Rodriguez Decl. ¶ 30; Gibbens Decl. Ex. 2(G).)

A few days later, Gibbens was contacted by the Lab's Quality

Assurance Manager Tony Arnold ("Arnold").  Arnold reported that on Friday,

February 11, 2011, Stephens left for the day without securing drug evidence,

including cocaine.  According to Harris, this incident was particularly concerning

because the evidence would have remained unsecured until Monday if Arnold had

not discovered it.  (Gibbens Decl. ¶ 27 & Ex. 2(H); Harris Decl. ¶ 39.)

On February 15, 2011 an administrative hearing on Stephens's

grievance concerning her November 2010 disciplinary action was conducted. An

independent hearing officer, Austin attorney Sue Berkel ("Berkel"), presided over

the hearing.  Berkel considered both documentary evidence and oral testimony

from Rodriguez, Gibbens, Arnold, Stephens, Mannix and other APD employees.

(Rodriguez Decl. ¶ 22; Gibbens Decl. ¶ 18; Harris Decl. ¶ 29; Mannix Decl. ¶ 38;

Paredes Decl. ¶¶ 11–14; Stephens Dep. at 106–07 & Ex. 14; Stephens Aff. ¶ 9.)

Berkel issued a report on February 22, 2011 that recommended

reversing all discipline against Stephens and reinstating her to her original position

as a Breath Test Technical Supervisor.  Berkel found that APD policy regarding

release of information "would appear to be overbroad and run contrary to state law

and the AG's opinions which have construed state law."  (Stephens Dep. Ex. 14.)

On February 23, 2011, Stephens sent Berkel's report to Rodriguez by email, stating her intent "to be gracious in victory" and "to continue to follow all APD policies." (Stephens Dep. at 109 & Ex. 13.) Rodriguez found the tone of the email inappropriate and forwarded it to Harris. Harris was concerned by both the email and other reports of Stephens's conduct. He consulted with Mannix, and they decided it was time to start working on discipline related to Stephens's other conduct. Harris and Mannix directed Paredes to begin working on a disciplinary meeting memo. (Rodriguez Decl. ¶ 23; Harris Decl. ¶¶ 30–32; Mannix Decl. ¶¶ 40–42; Paredes Decl. ¶ 18.)

Berkel's report was also forwarded to the City Manager's office. On April 6, 2011, the City Manager's decision upholding Stephens's discipline was forwarded by email to the relevant parties. (Harris Decl. ¶ 33.)

According to Rodriguez, on March 7, 2011, Stephens falsely accused Rodriguez of forwarding her a "bogus" court order. (Rodriguez Decl. ¶ 31.) Later in the day, Stephens confronted Rodriguez "in a hostile way" and threatened Rodriguez with a law suit. Rodriguez documented the conversations in a memo to Paredes, copying Gibbens and Harris. (Rodriguez Decl. ¶ 31 & Ex. 10; Gibbens Decl. ¶ 26; Harris Decl. ¶ 40.)

After this incident, Stephens sent an email to Gibbens, complaining about Rodriguez sending her an invalid court order. Stephens wrote:

I am not suggesting that you remove Ms. Rodriguez from her current job responsibilities, suspend her for three days, place her on probation for six months, humiliate her in front of her co-workers and professional associates, or bring her before the Assistant Chief and the Human Resources Manager for disciplinary action, but clearly she has violated our Division SOP's, Chapter 14 by not verifying that this was indeed a valid court order before proceeding to order the reanalysis of this blood sample.

> Forensic Science Division SOP, Chapter 14: "Evidence and the contents of laboratory case files under the control of the APD Forensic Science Division will not be released for defense examinations without a properly executed court order or subpoena for the records."

She clearly communicated with this defense attorney without communicating with the prosecutors in this case. I trust that you will take the appropriate steps to admonish Ms. Rodriguez for her actions. I would also humbly expect to be recognized for my astute actions in acting as a "gatekeeper" to the fair and honest administration of justice.

(Gibbens Decl. ¶ 26 & Ex. 3.)  According to Gibbens, he found Stephens's "tone and comments to be improper and insubordinate."  (Gibbens Decl. ¶ 26.)  Gibbens forwarded the email to Paredes for inclusion in the disciplinary meeting memo she was drafting.  (Gibbens Decl. Ex. 3; Paredes Decl. ¶ 21.)  On March 16, 2011, Paredes shared the information with the City's HR, noting the schedules of Mannix and Acevedo had prevented scheduling a pre-termination hearing.  (Harris Decl. ¶ 41; Paredes Decl. ¶ 23; Mannix Decl. ¶ 43; Acevedo Decl. ¶ 32.)

On April 5, 2011, Stephens gave Rodriguez a fax received on March 25, 2011, relating to a discovery motion in a pending case. Rodriguez noted the

12

cover letter stated Stephens had prior contact with the defense attorney, but the case file did not reflect that contact or any indication that the prosecutor had been notified. Rodriguez later discovered that Stephens had already sent the sample to an offsite lab on behalf of the defendant.  (Rodriguez Decl. ¶ 32; Rodriguez Dep. 164–65 & Ex. 10.)

On April 7, 2011, Stephens sent an email to Jeff Burton ("Burton") of the City's HR (the "Burton Email") complaining of the City's failure to accept Berkel's recommendation, that the Lab's policies violated the law, and that Lab personnel were not qualified.  (Resp., Ex. 4.)  This email was forwarded to Paredes the following day.  (Resp., Ex. 13 at 172.)  Burton investigated the issues raised in the email and followed up with Stephens.  (Id. at 45, 47–50, 172–73.)

On April 7, 2011, Rodriguez forwarded a job posting for a position in the Lab to the Texas Department of Public Safety ("DPS") and Southwestern Association of Forensic Scientists ("SWAFS").  The posting was for Carroll's position with responsibility for blood alcohol analysis and breath test technical supervision.[1]  DPS forwarded the job posting to its certified breath test technical supervisors, including Stephens and Carroll.  (Rodriguez Decl. ¶¶ 33–34; Gibbens Decl. ¶ 28; Paredes Decl. ¶ 25; Rodriguez Dep. at 127.)  In response, Stephens sent

---

[1] As discussed below, Carroll had resigned her position with APD on April 1, 2011.

13

an email (the "Beware Email") to the entire recipient list which states:

"BEWARE!! These people will do anything to destroy your career.  Laura Carroll

has resigned under the strain and they have done everything in their power to

destroy my career as a Technical Supervisor as well."  (Stephens Dep. at 129;

Resp., Ex. 2.)  A colleague forwarded the Beware Email to Gibbens on April 8.

Gibbens, in turn, forwarded it to Harris, Mannix, Paredes, and Acevedo.  Mannix

and Paredes considered the email unprofessional.  (Stephens Dep. Ex. 19; Harris

Decl. ¶ 43; Gibbens Decl. ¶ 29; Paredes Decl. ¶ 26; Mannix Decl. ¶¶ 46–47;

Acevedo Decl. ¶ 29).

On April 7, 2011, Stephens emailed Brandon Conrad ("Conrad") of

DPS (the "DPS Email").  Stephens asked Conrad to remove the APD job posting

from the SWAFS website.  She described APD as a "toxic work environment" and

accused APD administrators of doing "everything in their power to destroy my

character, reputation, and career by reprimanding me for following the laws in the

State of Texas."  (Resp., Ex. 3.)  Stephens further wrote:

> I would hate for anyone to accept a position with this department
> thinking that they will be treated fairly by this administration.  I
> intended to bring my supervisor, Gloria Rodriguez, up on ethics
> charges for lying under oath and bolstering her credentials.  SWAFS
> should post a warning to every ethical forensic scientist that this is not
> an organization worthy of SWAFS support.  In addition, they have
> destroyed the careers of many other fine scientists.

(Id.)

14

On April 7, 2011, Terry Gallegos ("Gallegos"), a colleague in Tucson, Arizona who had acted as auditor of the Lab in 2010, emailed Stephens about the job posting, asking "It looks like your job position? How are you?"  (Stephens Dep. at 117–18 & Ex. 17.)  Stephens responded to Gallegos via email ("Gallegos Email") and blind-copied Burton, but no one else.  (Resp., Ex. 1.)

In her lengthy response, Stephens addressed a number of topics, beginning with her November 2010 discipline and subsequent grievance, as well as the City Manager's decision to uphold her suspension.  (Stephens Dep. Ex. 17.) Stephens further wrote:

> While all of this was going on, they divided my responsibilities amongst two of my co-workers.  The young chemist who was assigned the breath alcohol duties, resigned under pressure.  She became addicted to Xanax and lost so much weight that she was diagnosed "anorexic".  When she asked to be returned to the drug lab, they wouldn't let her and her husband made her resign in order to rest and regain her health.  They destroyed this poor little girl's career! They are truly "evil"!  And this was only half of the job I handled for them! The chemist assigned the blood alcohol duties has never been trained to interpret the results and has refused to offer any extrapolation testimony (one [of] the requirements of an alcohol prosecution in Texas).  So, I am still subpoenaed to testify in all these cases, as they have no other expert.
>
> The State of Texas SOPs actually follow the law and state that all laboratory results are confidential . . . "except blood alcohol reports." And they are ISO certified. We still only hold a "legacy" certification.

(Id.)  Stephens continued, stating she was considering filing a professional conduct complaint with SWAFS against Rodriguez based on what Stephens viewed as

Rodriguez "bolstering . . . her expertise."  Stephens also recapped the hearing held in front of Berkel, and commented "because I made them look bad, they have continued to punish me in any way that they can."  She referenced the DPS email and wrote she had requested Conrad remove the job posting from the SWAFS website.  Stephens raised concerns about the qualification of Gibbens and others at the Lab.  She also stated her belief that "we would be better off with a regional lab . . . combining resources with the county and our local university." (Id.)

On April 8, 2011, Burton forwarded the Gallegos Email to Paredes. He also forwarded the email to Mark Washington and Carla Scales of the City's HR. Burton wrote:

> Mark and Carla - earlier this week the City Manager issued a decision to uphold the suspension and disciplinary probation for Debra Stephens, APD Forensic Scientist.  It is now alleged that Ms. Stephens attached a note (see her comments in red) regarding the posting that I believe in essence replaces her old role.  Additionally Ms. Stephens bcc'd me on a note she sent to a collegue (sic) in Arizona.  APD views both of these letters to be in violation of APD General Orders and is moving to terminate Ms. Stephens.  Ms. Stephens is likely to grieve this issue, has an attorney and I believe likely to seek media attention or escalate her concerns within or outside the City.

(Resp., Ex. 7).

According to Stephens, on April 11, 2011, she "was forced to leave the Lab and return [her] keys and security clearance."  (Stephens Aff. ¶ 13). Rodriguez and Gibbens gave Stephens a pre-termination notice dated April 11, 2011, and she was placed on administrative leave.  (Rodriguez Decl. ¶ 35; Gibbens

Dep. at 22, 158–59; Gibbens Decl. ¶ 32; Paredes Decl. ¶ 29; Stephens Dep. Ex. 18.)  The notice was signed by Mannix and informed Stephens that a pre-termination hearing had been scheduled for April 20, 2011.  The procedure was described, as well as the seven specific instances of alleged misconduct. (Stephens Dep. Ex. 18.)

Prior to the pre-termination hearing, Mannix briefed Acevedo on the general issues relating to Stephens's conduct, but not the details.  (Acevedo Dep. at 50; Acevedo Decl. ¶ 33; Mannix Decl. ¶ 52).  According to Rodriguez, Harris, and Mannix, at the pre-termination hearing on April 20, 2011, Stephens proffered a number of excuses for her conduct, but refused to take any responsibility for her actions.  (Rodriguez Decl. ¶ 36; Harris Decl. ¶ 46; Mannix ¶ 53.)  At that time, all three individuals agreed that Stephens's conduct would not change, the operation of the Lab would be affected, and her employment should be terminated. (Rodriguez Decl. ¶ 36; Harris Decl. ¶ 46; Mannix ¶¶ 53–54.)

Paredes prepared a termination letter for Acevedo's signature, which was reviewed by both HR and the legal department.  Acevedo was briefed specifically on the facts in the termination letter, but was not provided with the underlying documents, as he relied Mannix's review of those.  (Paredes Decl. ¶ 30; Acevedo Decl. ¶¶ 34–35; Acevedo Dep. at 133–34; Mannix Decl. ¶ 54.)

The termination letter, dated April 29, 2011, identifies several reasons

for the termination of Stephens's employment, effective April 25, 2011:

1.   The Gallegos Email because Stephens "discussed former employee's medical conditions without the employee's knowledge or permission" and because Stephens mentioned instructing a SWAFS representative to remove a job posting although she has "no authority to request that this job posting be withdrawn and [the] request interferes with and undermines the Department's recruitment efforts."

2.   The Beware Email because Stephens's comments were "highly inappropriate" and "disparaging to both your chain of command and the Austin Police Department."

3.   Carroll's resignation as being in large part due to the hostile work environment Stephens created, as well as Stephens's untruthful remark in her email that she left because APD "destroyed her career."

4.   Stephens's March 29, 011 email, in which Stephens disclosed to an APD detective results that had not been administratively approved for dissemination.

5.   The February 11, 2011 incident in which Stephens left evidence unsecured.

6.   The January 31, 2011 discovery that Stephens had released a draft report to an officer without administrative approval, Rodriguez's discussion of the matter with Stephens, coupled with Stephens's denial at her pre-termination hearing that Rodriguez had brought the case to her attention.

7.   Stephens calling Rodriguez "evil" and stating she wished Rodriguez would suffer like she had, which resulted in the January 10, 2011 reprimand.

(Acevedo Dep. Ex. 6.)

According to Acevedo, based on his briefings with, and the recommendation of, Mannix, he determined terminating Stephens was appropriate for the reasons listed in the termination letter he signed.  (Acevedo Decl. ¶ 35; Acevedo Dep. at 51, 58–59, 64–65 & Ex. 6).  Specifically, Acevedo testified:

> [Stephens] wasn't fired for the [Gallegos] e-mail in its totality.  She was fired for the parts of the e-mail that are referenced in the termination letter . . . not the email in its totality . . . It says what we specifically found to be a violation. Here's the e-mail that's referenced.  Here is the part of this e-mail that we find to be problematic.  It doesn't say any of the rest of it was problematic.  It specifically listed exactly – referenced exactly what was problematic . . . .

(Acevedo Dep. at 75–77.)  Both Mannix and Paredes state that, even without the Gallegos and Beware Emails, the City had enough documented issues with Stephens's conduct to justify termination of her employment.  (Mannix Decl. ¶ 55; Paredes Decl. ¶ 31.)

On April 20, 2011, Stephens sent a letter ("ASCLD Letter") to Ralph Keaton, Director of the American Society of Crime Lab Directors ("ASCLD").  In the letter, Stephens stated she had been disciplined for violating SOPs which she believed violated state law.  She also stated her employment was terminated, noting "[e]vidently, they received a copy of an email correspondence I had sent to [Burton] stating that I intended to report these violations of Texas law to the Texas Forensic Science Commission and ASCLD."  (Resp., Ex. 5.)  An independent audit

was initiated of the Lab based on the ASCLD Letter, which revealed some deficiencies within the Lab.  (Resp., Ex. 9 at 182–83; id., Ex. 10 at 175.)

Stephens appealed her termination.  An independent hearing examiner, Pamela Lancaster ("Lancaster"), conducted a hearing on June 20, 2011. In the "Significant Fact Finding" portion of her report, Lancaster found that: (1) Stephens's "disciplinary probation warned her to discontinue disrespectful, unprofessional conduct toward lab staff"; (2) Stephens "displayed disrespectful, unprofessional behavior toward her supervisors during her probation"; (3) Stephens "wrote an email critical of APD lab, discouraging anyone from applying" for a job in the Lab; and (4) Stephens's "behavior would not change if she was returned to her job at APD."  (Stephens Dep. at 236 & Ex. 39.)

On July 21, 2011, a Grievance Committee composed of City employees reviewed the hearing officer's report and presentations by Stephens and APD and recommended upholding Stephens's termination.  City Manager Mark Ott formally upheld the termination of Stephens's  employment on August 18, 2011.  (Stephens Dep. at 241–42 & Ex. 40; Mannix Decl. ¶ 57; Acevedo Decl. ¶ 38 & Ex. 2; Paredes Decl. ¶ 32; Mannix Decl. ¶ 57).

## II.    Procedural Background

Stephens originally filed this action in the 53rd Judicial District Court of Travis County, Texas on April 27, 2012.  (Dkt. # 1, Ex. 3.)  The City and

20

Acevedo removed this action to this Court on July 19, 2012.  (Dkt. # 1.)  Shortly

thereafter, Stephens amended her complaint in federal court.  ("SAC," Dkt. # 7.)

She named the City, Acevedo, Mannix, and Rodriguez as defendants.  (Id. ¶¶ 1–5.)

Stephens's Complaint alleged that she was terminated as a result of her exercise of

her right to free speech under the First Amendment and on the basis of her race and

sex.  (Id. ¶¶ 31–53.)  She asserted causes of action under 42 U.S.C. § 1983

("Section 1983") against the City and Acevedo and under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title VII").  (Id.)  Stephens

sought compensatory and punitive damages, as well as attorneys' fees.  (Id. ¶ 54.)

        By order dated December 5, 2012, the Court granted in part the

motion to dismiss by Acevedo and the City, dismissing Stephens's Title VII claim

in its entirety, her Section 1983 claim against Acevedo in his official capacity, and

her claim for punitive damages against the City and Acevedo in his official

capacity.  (Dkt. # 25.)  By order dated January 11, 2013, the Court granted

Stephens's voluntary dismissal of her claims against Mannix and Rodriguez.  (Dkt.

# 28.)  Accordingly, only Stephens's Section 1983 claims against the City and

Acevedo in his individual capacity survived.

        On May 1, 2013, Stephens filed a Motion to Compel discovery from

Defendants, requesting documents relating to Defendants' employee disciplinary

records. (Dkt. # 33.)  In her Motion, Stephens argued that the information that she

sought was relevant to show pretext.  (Id. at 5.)  On June 14, 2013, Magistrate

Judge Lane denied the request for discovery, finding that evidence of pretext was

irrelevant to Stephens's claim because of Charles v. Grief, 522 F.3d 508 (5th Cir.

2008).  (Dkt. # 38 at 6.)

On December 20, 2013, the City and Acevedo filed a motion for

summary judgment as to the claims remaining against them.  They contended

Stephens's First Amendment claim fails because: (1) to the extent she complains of

any action other than the termination of her employment, she has not identified the

requisite adverse employment action; (2) her speech was not protected activity;

(3) she has not established a causal connection between her speech and the

termination of her employment; (4) their interest in efficiency outweighed

Stephens's interest in commenting on matters of public concern; and (5) they

would have terminated Stephens's employment even in the absence of her

protected speech.  (Mot. at 20–35.)  Acevedo additionally contended: (1) he is

entitled to qualified immunity; and (2) Stephens's claim against him for punitive

damages fails.  (Id. at 35–39.)

On March 31, 2014, Magistrate Judge Mark Lane issued a Report and

Recommendation on Defendants' Motion for Summary Judgment.  ("Rep.," Dkt.

# 69.)   The Magistrate Judge recommended that Defendants' Motion be granted

because Defendants' interest in maintaining an efficient workplace outweighed

Stephens's few instances of protected speech and Defendants would have terminated Stephens's employment irrespective of her protected speech.  (Id. at 32, 35.)  Because he concluded that Stephens failed to show a First Amendment violation, the Magistrate Judge also recommended that any claims against Defendant Acevedo were barred by qualified immunity and that punitive damages were unavailable.  (Id. at 36.)

On April 14, 2014, Stephens timely filed her objections to the Magistrate Judge's Report and Recommendation.  (Obj.)  Defendants filed a Response.  ("Obj. Resp.," Dkt. # 72.)  At the June 25, 2014 hearing on Stephens's Objections, the parties acknowledged that when the Magistrate Judge issued his ruling on Stephens's Motion to Compel (dkt. # 38), Charles dictated that pretext was not a consideration in a First Amendment retaliation case; however, after the Magistrate Judge's ruling on the Motion to Compel, but before he issued his ruling on Defendants' Motion for Summary Judgment, the Fifth Circuit decided Haverda v. Hays Cnty., 723 F.3d 586, 595 (5th Cir. 2013), which held that "[a]n employee can, however, refute that showing by presenting evidence that 'his employer's ostensible explanation for the discharge is merely pretextual.'" 723 F.3d at 592 (quoting Coughlin v. Lee, 946 F.2d 1152, 1157 (5th Cir. 1991)).

Thereafter, on July 18, 2014, this Court ordered additional discovery on pretext and ordered the parties to provide supplemental briefing on the pretext

question raised by <u>Haverda</u>.  The parties submitted supplemental briefing on August 28, 2014, and September 2, 2014, respectively.  (Dkts. # 80, 81.)

<u>LEGAL STANDARDS</u>

I.     <u>Review of a Magistrate Judge's Memorandum and Recommendation</u>

Any party may contest the Magistrate Judge's findings by filing written objections within fourteen days of being served with a copy of the Report and Recommendation.  28 U.S.C. § 636(b)(1)(C).  The objections must specifically identify those findings or recommendations that the party wishes to have the district court consider.  <u>Thomas v. Arn</u>, 474 U.S. 140, 151 (1985).  A district court need not consider "[f]rivolous, conclusive, or general objections."  <u>Battle v. U.S. Parole Comm'n</u>, 834 F.2d 419, 421 (5th Cir. 1987) (quoting <u>Nettles v. Wainwright</u>, 677 F.2d 404, 410 n.8 (5th Cir. 1982), <u>overruled on other grounds by</u> <u>Douglass v. United States Auto. Ass'n</u>, 79 F.3d 1415 (5th Cir. 1996)).

The Court must conduct a de novo review of any of the Magistrate Judge's conclusions to which a party has specifically objected.  <u>See</u> 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.").  On the other hand, findings to which no specific objections are made do not require de novo review; the Court need only determine whether the Report and Recommendation is clearly erroneous or contrary to law.  <u>United</u>

24

States v. Wilson, 864 F.2d 1219, 1221 (5th Cir. 1989).

II.      Motion for Summary Judgment

         Summary judgment is granted under Federal Rule of Civil Procedure

56 when "the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

see also Meadaa v. K.A.P. Enterprises, L.L.C., 756 F.3d 875, 880 (5th Cir. 2014).

"Substantive law will identify which facts are material."  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is only genuine "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

         The moving party bears the initial burden of demonstrating the

absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986).  If the moving party meets this burden, the nonmoving party must

come forward with specific facts that establish the existence of a genuine issue for

trial.  Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703,

706 (5th Cir. 2013) (quoting Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621

(5th Cir. 2000)).  "Where the record taken as a whole could not lead a rational trier

of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (quoting Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

         In deciding whether a fact issue has been created, "the court must

25

draw all reasonable inferences in favor of the nonmoving party, and it may not

make credibility determinations or weigh the evidence." EnerQuest Oil & Gas,

LLC v. Plains Exploration & Prod. Co., 981 F.Supp.2d 575, 584 (5th Cir. 2013)

(quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

However, "[u]nsubstantiated assertions, improbable inferences, and unsupported

speculation are not sufficient to defeat a motion for summary judgment." United

States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012) (quoting Brown v.

City of Hous., 337 F.3d 539, 541 (5th Cir. 2003)).

DISCUSSION

To establish a claim for employment retaliation related to speech, a

plaintiff-employee must satisfy four elements: "(1) [she] suffered an 'adverse

employment decision'; (2) [her] speech involved 'a matter of public concern'; (3)

[her] 'interest in commenting on matters of public concern . . . outweighs the

[d]efendant's interest in promoting efficiency'; and (4) [her] speech motivated the

adverse employment decision." Haverda v. Hays Cnty., 723 F.3d 586, 591 (5th

Cir. 2013) (quoting Beattie v. Madison Cnty. Sch. Dist., 254 F.3d 595, 601 (5th

Cir. 2001)).

Once a plaintiff has met her "burden of showing that [her] protected

speech was a substantial or motivating factor in the defendant's adverse

employment decision, a defendant may still avoid liability by showing, by a

26

preponderance of the evidence, that it would have taken the same adverse

employment action even in the absence of the protected speech." Id. (citing Mt.

Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)); accord

Kostic v. Texas A & M Univ. at Commerce, 3:10-CV-2265-M-BN, 2014 WL

1315657, at *22 (N.D. Tex. Mar. 31, 2014) ("That is, even if Plaintiff could show

that his protected speech was a motivating factor in his termination, the Individual

Defendants may still avoid liability by showing they would have taken the same

action of terminating him even in the absence of the protected speech.").

        "An employee can, however, refute that showing by presenting

evidence that 'his employer's ostensible explanation for the discharge is merely

pretextual.'" Haverda, 723 F.3d at 591 (quoting Coughlin, 946 F.2d at 1157).

"Pretext is more than a mistake on the part of the employer; it is a phony excuse."

Hudson v. Chi. Transit Auth., 375 F.3d 552, 561 (7th Cir. 2004).  A plaintiff may

prove pretext by establishing that (1) the employer's reason had no basis in fact;

(2) that the explanation was not the real reason for its action; or (3) that the reason

stated was insufficient to warrant the adverse job action.  Atanus v. Perry, 520 F.3d

662, 674 (7th Cir. 2008); accord Morris v. City of Chillicothe, 512 F.3d 1013,

1019 (8th Cir. 2008) ("Pretext may be shown with evidence that an employer has

proffered an explanation with no basis in fact, with evidence that the plaintiffs

recently received favorable reviews, or with evidence that the employer's proffered

reason for its employment decision has changed substantially over time.").

I.     The Magistrate Judge's Report and Recommendation

In his Report and Recommendation, the Magistrate Judge recommended that Defendants' Motion for Summary Judgment be granted.  First, he concluded that Defendants were entitled to summary judgment because Stephens failed to state a prima facie case for First Amendment retaliation.  (See Rep. at 32.)   He found that Stephens's termination qualified as an adverse employment action, that the Gallegos and ASCLD letters were the only forms of protected speech, and that there was a causal connection between the Gallegos letter and Stephens's termination.  However, he concluded that Defendants' interest in maintaining an efficient workplace outweighed Stephens's protected speech.  (Id.)  Because Stephens failed to meet the fourth element for her First Amendment retaliation claim, the Magistrate Judge held that Stephens failed to state a prima facie case and Defendants should be granted summary judgment on that basis.  (Id.)

Second, he found that even if Stephens's demonstrated a prima facie case, Defendants were still entitled to summary judgment because they would have terminated Stephens's employment irrespective of her protected speech.  (Id. at 32–25.)  The Magistrate Judge found that Defendants set forth ample evidence that Stephens would have been terminated absent her protected speech because of her

numerous job performance issues and the fact that the disciplinary process leading to the termination of her employment began at least a month before Stephens engaged in the speech at issue.  (Id.)  Additionally, the Magistrate Judge concluded that Stephens failed to rebut Defendants' evidence that they would have terminated Stephens's employment even in the absence of her protected speech. (Id.)  In so finding, he noted that Stephens failed to produce any evidence that Defendants' proffered reasons for her termination were pretextual—specifically pointing to her failure to show any other employee with a similar discipline and work record who was not terminated.

Finally, the Magistrate Judge found that Defendants were entitled to qualified immunity and that Stephens's request for punitive damages was moot because Stephens failed to show a constitutional violation.  (Id. at 36.)

Stephens objects on the basis that (1) the other three emails she presented are protected speech, (2) the ASCLD letter is causally connected to her discharge, (3) her interests in protected speech outweighed Defendants' interest in efficiency, (4) she had no opportunity to undergo discovery to prove the pretext issue, and (5) there was a constitutional violation, thus rendering the rulings on qualified immunity and punitive damages incorrect.  She does not object that her discharge was the sole adverse employment action, that the Gallegos Email and ASCLD letter were protected speech, or that there was a causal relationship

29

between the Gallegos Email and her termination.  Because of the dependent

relationship between Stephens's objections and the prima facie analysis, the Court

will address Stephens's objections in the order of the elements necessary to

establish a claim for First Amendment retaliation.

II.     The Prima Facie Case

        A.     Adverse Employment Action

              Because Stephens does not object to the Magistrate Judge's finding

that Stephens's discharge is the adverse employment action at issue, the Court

reviews the finding for clear error.  The Court agrees that Stephens's discharge is

the only adverse employment action that occurred in her case and that is actionable

in the First Amendment context.

        B.     Protected Speech

              Stephens objects to the Report and its findings related to the "Burton

Email," "DPS Email," and "Beware Email," claiming that the Magistrate Judge

erred in finding these writings to be unprotected speech.  (Obj. at 11.)  Stephens

does not proffer any additional argument to support her objection.

              As a preliminary matter, Stephens's general objection fails to pass

muster.  The Western District's Local Civil Rules, which have the force of law, see

Hollingsworth v. Perry, 558 U.S. 183, 191 (2010), require that the "written

objections . . . specifically identify the portions of the proposed findings,

recommendations or report to which objection is made <u>and the basis for such</u> <u>objections</u>."  W.D. Tex. Assignment of Duties to United States Magistrate Judges Rule 4(b); <u>see also</u> <u>Macort v. Prem, Inc.</u>, 208 F. App'x. 781, 785 (11th Cir. 2006) (holding that merely reciting language from a previous order of the court or failing to set forth the applicable law is not a specific objection to anything in the report and recommendation that would trigger de novo review by the district court).  It is insufficient to merely "object."

   However, even entertaining Stephens's general and non-specific objection, neither the Burton Email, the DPS Email, nor the Beware Email qualify as protected speech.  A public employee's speech is only constitutionally protected if it "addresses a matter of 'public concern.'"  <u>Harris ex rel. Harris v. Pontotoc</u> <u>Cnty. Sch. Dist.</u>, 635 F.3d 685, 692 (5th Cir. 2011) (quoting <u>Connick v. Myers</u>, 461 U.S.138, 147 (1983)).  "Matters of public concern are those which can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'"  <u>Branton v. City of Dall.</u>, 272 F.3d 730, 739 (5th Cir. 2001) (quoting <u>Connick</u>, 461 U.S. at 146).

   Notwithstanding this principle, even when a public employee's speech relates to a topic of public interest, as is often the case in the public employment setting, it is not considered to be on a "matter of public concern" if the speaker spoke as an employee rather than as a citizen.  <u>Harris</u>, 635 F.3d at 692; <u>see also</u>

31

Connick, 461 U.S. at 147.  In other words, speech that is purely on a matter of personal interest in an employment decision is spoken as an employee and is not constitutionally protected.  Benningfield v. City of Hous., 157 F.3d 369, 375 (5th Cir. 1998); Connick, 461 U.S. at 147–48.  Nevertheless, "[t]he existence of an element of personal interest on the part of an employee in the speech does not prevent finding that the speech as a whole raises issues of public concern."  Dodds v. Childers, 933 F.2d 271, 273 (5th Cir. 1991).  Speech that touches both matters of public and personal interest—so-called "mixed speech"—remains protected by the First Amendment as long as it was made "predominantly 'as a citizen.'"  Harris, 635 F.3d at 692 (quoting Dodds, 933 F.2d at 273).

In mixed speech cases, courts must analyze the content, form, and context of the speech to determine whether it was made predominately as a citizen. See Teague v. City of Flower Mound, Tex., 179 F.3d 377, 382 (5th Cir. 1999). "The content, form, and context of a given statement, as revealed by the whole record" determines whether a plaintiff spoke primarily as a citizen on a matter of public concern or as an employee on a matter of personal interest.  Connick, 461 U.S. at 147–48; see also Moore v. City of Kilgore, 877 F.2d 364, 370 (5th Cir. 1989) (holding that the "content, form, and context" factors "must be considered as a whole package, and [their] significance . . . will differ depending on the circumstances of the particular situation.").  The Fifth Circuit has recognized

"three reliable principles" derived from its case law regarding whether the content

of a public employee's speech is made as a citizen on a matter of public concern:

> First, the content of the speech may relate to the public concern if it does not involve solely personal matters or strictly a discussion of management policies that is only interesting to the public by virtue of the manager's status as an arm of the government.  If releasing the speech to the public would inform the populace of more than the fact of an employee's employment grievance, the content of the speech may be public in nature.

> Second, speech need not be made to the public, but it may relate to the public concern if it is made against the backdrop of public debate.

> And third, the speech cannot be made in furtherance of a personal employer–employee dispute if it is to relate to the public concern.

Kennedy v. Tangipahoa Parish Library Bd. of Control, 224 F.3d 359, 372 (5th Cir.

2000) (citing cases), abrogated on other grounds by Cuvillier v. Taylor, 503 F.3d

397, 401 (5th Cir. 2007); see also Durrett v. Vargas, 250 F.3d 743, at *3 (5th Cir.

2001) (noting that these factors are applicable within the content prong).  In

accordance with these precepts, the Fifth Circuit has specifically noted that speech

regarding "internal personnel disputes and working conditions" will not ordinarily

involve the public concern.  See Alexander v. Eeds, 392 F.3d 138, 142 (5th Cir.

2004) (quoting Branton, 272 F.3d at 739).

> 1.    Burton Email

First, Stephens objects to the Magistrate Judge's finding that the

Burton email was not protected speech.  Stephens contends that the Burton email

constitutes protected speech because it contains allegations of corruption and impropriety within APD and challenges to the integrity and reliability of the Lab, which are matters of public concern.  (Dkt. # 62 ¶ 57.)  She emphasizes that she sent the email from her personal work account to a non-supervisor while she was off-duty, and the matters at issue "are not related to [her] job as a chemist."  (Id. ¶ 56.)  Defendants counter that, at its base, the Burton Email is a complaint about the decision to uphold her suspension and is therefore in furtherance of a personal employer–employee dispute.  (Dkt. # 64 at 8.)

Upon review, the first four paragraphs of the Burton email contain descriptions of Stephens's personal dissatisfaction with the results of her suspension hearing and the alleged retaliation that she experienced, followed by a defense of her qualifications.  (See Resp., Ex. 4.)  These paragraphs of the email are not protected speech; they are purely in furtherance of a personal employer–employee dispute, which is not content related to the public concern.  See Kennedy, 224 F.3d at 372.

In contrast, the fifth and sixth paragraphs present a closer question. They read:

> Who do I appeal to when I tell you that something wicked is going on at APD when they violate their own policies and hire un-qualified administrators.  Clearly, the job descriptions of my administrators requires a college degree.  When Mr. Bill Gibbens, Forensic Science Manager was promoted in 2002, he did not possess a college degree. In 2005, when the laboratory was inspected, we took a serious hit

34

because he was not qualified.  Mr. Ed Harris, the Technical Services
Bureau Chief, suggested that Mr. Gibbens obtain some sort of degree.
Mr. Gibbens purchased some sort of degree off the internet, and I
assume the citizens of Austin paid for much of that.  However, to this
day, our assistant administrator, Mr. Jerry Pena, does not hold any sort
of college degree and this is clearly a violation of the requirements of
his position.

I have a college degree and have been a scientist for almost thirty
years.  It is crazy to me that the crime laboratory could be run by
anyone other than a scientist.  APD prides themselves on their
"model" crime lab, but there are several cracks in this facade.  As long
as they are able to continue punishing good employees and writing
policies that violate the law, and get the backing of the City
Manager's office, these attrocities [sic] will continue.

(Resp., Ex. 4.)  These paragraphs constitute mixed speech.  Stephens speaks as an

employee, since she is discussing matters related to her employment.  However,

she also speaks as a citizen—writing while off-duty from her own personal email

account.  (Id.)  Therefore, the Court analyzes whether, under the content–form–

context test, Stephens was speaking predominately as a citizen or employee.

a.     Content

The content of Stephens's speech weighs in favor of holding that she

did not speak on a matter of public concern.  The paragraphs of the email at issue

discuss the qualifications of Stephens's supervisors, whom she alleges are

unqualified to lead a crime lab.  (Id.)  Following the Fifth Circuit's

pronouncements, the Court finds that her comments are essentially "a discussion of

management policies that are only of interest to the public by virtue of the

35

manager's status as an arm of the government."  Kennedy, 224 F.3d at 372.

Gibbens's qualifications would be of no public interest but for his employment at

the agency.  While his qualifications may or may violate the requirements of the

position, the requirements are pursuant to internal city polices that are not of broad

public concern.  Her statements are similar to allegations of favoritism, which the

Fifth Circuit maintains are not a public concern.  Moore, 871 F.2d at 551.

       Second, although Stephens has alleged that there was news interest in

the issue around this time, she has not alleged or presented sufficient evidence that

her comments were made against the backdrop of public debate.  In support of her

argument, Stephens claims that "[she] was contacted by a media member just

weeks before she was fired, inquiring about [her] job status and the status of the

APD crime lab."  (Resp. ¶ 50.)  Stephens's affidavit, upon which she relies for the

above statement, is more circumscribed in its description: her affidavit states that a

newspaper reporter contacted her in late March "regarding the Lab and the validity

of DWI cases in Travis County."  (Resp., Ex. 8 ¶ 10.)  Stephens also points to

Acevedo's testimony that "in his opinion there has been media coverage about the

drug analysis in the crime lab."  (Dkt. # 65 ¶ 2.)

       Stephens is correct that "[t]he very fact of newspaper coverage [of the

matter discussed by the employee] indicates that 'the public was receptive and

eager to hear about' [the matter]."  Salge v. Edna Indep. Sch. Dist., 411 F.3d 178,

36

189 (5th Cir. 2005) (internal quotation marks omitted) (quoting <u>Kenendy</u>, 224 F.3d at 371).  However, Stephens's allegations that a newspaper reporter contacted her "regarding the Lab" and that there was media coverage about the drug analysis is not specific enough to show that the media was particularly interested in the sort of "misconduct" that Stephens alleges.  Her allegations of media interest are insufficient to overcome the other factors of the content analysis, which indicate that Stephens spoke as an employee on a matter of personal interest.

Third, Stephens's speech is in furtherance of the personal employee–employer dispute in which she was engaged with the Lab.  There is no evidence that her speech is motivated by a concern to expose the Lab's alleged misconduct to the public: in the context of the other paragraphs of her email, her statements are fuel to justify her dissatisfaction with the process that she was given.  Therefore, the content factor weighs in favor of holding that Stephens did not speak on a matter of public concern.

   b. <u>Form</u>

The Court finds that the form factor does not weigh in favor of either party.  As Stephens points out, Stephens sent the email while off-duty from her personal account.  Ordinarily, this would weigh toward a finding that she was not speaking as an employee on a matter of personal interest, at least with regard this factor.  <u>See</u> <u>Bradshaw v. Pittsburg Indep. Sch. Dist.</u>, 207 F.3d 814, 817 (5th Cir.

2000) (finding that memos signed in the plaintiff's professional capacity and written on school letter head favored a conclusion that plaintiff drafted the documents in her capacity as a public employee).  However, it is relevant that Stephens affirmatively initiated the speech without any prompting.  See Salge, 411 F.3d at 189 ("The fact that an employee responds to an invitation to speak rather than initiating the speech weighed heavily in favor of finding speech on a matter of public concern.").  Additionally, Stephens addressed her speech to a city employee who was part of the Human Resources Department.  "When a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job."  Davis v. McKinney, 518 F.3d 304, 313 (5th Cir. 2008).  Therefore, the form prong does not favor either party.

c.   <u>Context</u>

The context of the email indicates that Stephens was speaking as an employee in her personal interest.  As discussed above, the email is structured as a complaint to Human Resources about the results of Stephens's disciplinary hearing, which Stephens received two days earlier.  In her email, Stephens forwards the final disposition of her hearing.  Additionally, she speaks to a one-member audience: Burton.

38

The allegations that she makes in the two paragraphs at issue arise from an interest in addressing what she believes is a miscarriage of justice in her personal employment hearing, rather than a general interest in exposing corruption in the Lab.  Moreover, the email is part of a series of emails that she wrote after receiving the final decision from her disciplinary hearing. (Dkt. # 64 at 7.)  Given these facts, the context factor weighs in favor of finding that Stephens was speaking as an employee in her personal interest.

Accordingly, the Court finds that the Burton Email did not constitute protected speech.

2.    DPS Email

Next, Stephens objects that the DPS email constitutes protected speech.  The DPS email reads:

> I would like you to remove the APD job posting from the SWAFS website.  APD is a toxic work environment.  As a distinguished member of your organization, I can tell you first hand that these administrators at APD have done everything in their power to destroy my character, reputation, and career by reprimanding me for following the laws in the State of Texas.  I have the backing of DPS, the legal community (including prosecutors and defense attorneys), MADD, and fellow forensic scientists.  I would hate for anyone to accept a position with this department thinking that they will be treated fairly by this administration.  I intended to bring my supervisor, Gloria Rodriguez up on ethics charges for lying under oath and bolstering her credentials.  SWAFS should post a warning to every ethical forensic scientists that this is not an organization worthy of SWAFS support.  In addition, they have destroyed the careers of many other fine scientists including Cicely Hamilton, Laura Carroll, and Jenny LaCoss.

(Resp., Ex. 3.)

Stephens contends that the DPS email constitutes protected speech because it alleges evidence of corruption and malfeasance within APD, which is a matter of public concern.  (Dkt. # 62 ¶ 53.)  She emphasizes that the email was sent from her private email account while she was off-duty and that it did not relate to her job as a chemist.  (Id.)  Defendants counter that the email focuses on the grievance hearing and that the statements are "an airing o[f] her private dispute with APD."  (Dkt. # 64 at 8.)

A mixed-speech analysis is again required, since Stephens speaks off-duty from a private email account, but speaks about issues related directly to her employment.

### a.   Content

The content of the email indicates that Stephens spoke as an employee on a matter of personal interest.  The bulk of the content in the DPS Email involves personal matters and management policies "only interesting to the public by virtue of the manager's status as an arm of the government."  See Kennedy, 224 F.3d at 372.  Stephens's claims that APD is a toxic work environment, that administrators have destroyed her career and the careers of other scientists, and that applicants should be wary of the Department treating them fairly.  These are all general statements that stem from Stephens's internal personnel dispute.  The generality of

40

the language fails to "inform the populace of [any] more than the fact of [her] employment grievance."  See Kennedy, 224 F.3d at 372.

Arguably, the statement that Rodriguez lied under oath could be of public concern.  However, the alleged perjury occurred during Stephens's grievance hearing; Stephens's concern about Rodriguez's conduct arises from her dissatisfaction with the results of the hearing, not from a general concern to blow the whistle on the Department's conduct.  (See Resp., Ex. 1 at 2.)  Stephen's statements regarding Rodriguez constitute speech made in furtherance of a personal employer–employee dispute, which does not relate to the public concern. See Kennedy, 224 F.3d at 372.

Finally, Stephens's arguments that her comments were made with the backdrop of public debate are unavailing.  Stephens advances the same arguments in support of public debate here that she advanced with regard to the Burton email, so the Court does not reiterate them here.

b.   Form

The form of the email does not favor either side of the public/private analysis.  As Stephens correctly notes, she wrote the email from her personal email account while off-duty, which indicates that she may have written as a public citizen, rather than an employee.  See Bradshaw, 207 F.3d at 817.  However, like in the Burton Email, Stephens affirmatively initiated this speech—she was not

merely responding to an inquiry.  See Salge, 411 F.3d at 189.  Therefore, the form

consideration does not weigh on either side.

c.    <u>Context</u>

Similarly, the context of the DPS Email weighs in favor of finding

that Stephens spoke as an employee on a matter of personal interest.  The email

arises out of her personal employee-employer dispute with the Department.  It was

motivated by the results of the hearing, which Stephens received the day before.

Stephens's references to the support of various entities and her belief that

Rodriguez was dishonest during her grievance hearing both relate directly to the

grievance hearing at issue.

Additionally, although her audience is a state employee who is outside

of the city, the purpose of her email is to remove a job posted by her employer.  In

this context, her speech appears to be focused on her internal dispute with the

Department, rather than a matter of concern to the community.  See Branton, 272

F.3d at 739.

Having weighed the content, form, and context of the DPS Email, the

Court concludes that Stephens spoke as an employee on a matter of personal

interest, and the email is therefore unprotected.

42

3.     Beware Email

Third, Stephens objects that the Beware Email constitutes protected

speech.  The Beware Email reads:

> BEWARE!!  These people will do anything to destroy your career.
> Laura Carroll has resigned under the strain and they have done
> everything in their power to destroy my career as a Technical
> Supervisor as well.

(Resp., Ex. 2.)

Stephens contends that the Beware email constitutes protected speech

because it was sent to people outside of APD to warn of malfeasance within APD

and because it was not made within the scope of her official job duties.  (Dkt. # 62

¶ 52.)  Defendants counter that email is personal, and constitutes a mere "attempt

to hinder APD from hiring someone to fill what she believed was her position."

(Dkt. # 64 at 9.)

This email is purely in furtherance of an employer–employee dispute.

Stephens does not make any specific allegations of misconduct or malfeasance.

Moreover, none of her general statements are specific enough to be of interest to

the public in determining whether the Department was involved in misconduct.

The email constitutes "speech that is purely on a matter of personal interest in an

employment decision" and is therefore "spoken as an employee and is not

constitutionally protected."  See Benningfield, 157 F.3d at 375.

Even if the Court were to assume that the Beware Email presented a mixed speech situation, it nevertheless fails the content–form–context test and is unprotected.

First, the content of the email weighs in favor of finding that the speech was not on a matter of public concern.  The email does not cast light on any public malfeasance; it involves very broad allegations that stem from Stephens's internal personnel dispute.  The language "does not disclose any specific evidence of corruption, impropriety, malfeasance, or misbehavior," nor does it blow the whistle on any illegal action by the Department.  See Willaims v. Dall. Indep. Sch. Dist., No. 3:04-cv-1386, 2005, WL 2317985 (N.D. Tex. Sept. 21, 2005) (citing Branton, 272 F.3d at 739; Brawner v. City of Richardson, Tex., 855 F.2d 187, 191–192 (5th Cir. 1988)), aff'd, 480 F.3d 689 (5th Cir. 2007).  The generality of the language fails to "inform the populace of [any] more than the fact of [her] employment grievance."  See Kennedy, 224 F.3d at 372.  In essence, the content of the email is an ad hominem attack directed against the Defendants presenting only general complaints from a dissatisfied employee.

Similarly, the form of the email indicates that Stephens spoke as an employee on a matter of personal interest.  Although she sent the email from her personal account, she received the email that she forwarded through her work account, and she then forwarded it to various government employees throughout

44

the state. (<u>See</u> Resp., Ex. 2 at 1.)  <u>See also</u> <u>Bradshaw</u>, 207 F.3d at 817 (finding

significant in form analysis that the plaintiff signed the memos with her title and

printed them on official letterhead).  Moreover, she affirmatively initiated this

speech—she was not merely responding to an inquiry.  <u>See</u> <u>Salge</u>, 411 F.3d at 189.

   Finally, the context of the email also indicates that Stephens spoke as

an employee on a matter of personal interest.  Stephens wrote this email two days

after the City Manager upheld her suspension.  (Dkt. # 64 at 7.)  It was part of a

series of emails that Stephens wrote following that decision, all of which arose

from her perception that the hearing disposition was unfair.  (<u>Id.</u>; <u>see also</u> Resp.,

Ex. 1 at 1.)

   Based on the content, form, and context of the Beware Email, the

Court concludes that Stephens spoke as an employee on a matter of personal

interest, and the email is therefore unprotected.

   4. <u>Gallegos Email</u>

   Because Stephens does not object to the finding that the Gallegos

Email was protected speech, the Court reviews the conclusion for clear error.  The

Court agrees with the Magistrate Judge that the email contains allegations of

official misconduct and public malfeasance, albeit intertwined with an account of

Stephens's interpersonal discipline, as well as a fellow employee's health and

purported addiction.  Relying on the mixed speech doctrine, the Court agrees that

the Gallegos email constitutes protected speech, at least as to the portions that address public malfeasance and official misconduct.

     5.    ASCLD Letter

Again, the Court reviews the Magistrate Judge's finding that the ASCLD letter constituted clear error, since there are no objections.  The Court agrees that, because Defendants do not dispute that the ASCLD Letter constituted protected speech, it is properly considered as such.

     C.    Causal Connection

First, Stephens makes a general, non-specific objection to the Magistrate Judge's findings that the ASCLD Letter was not casually connected to the adverse employment action.  (See Obj. at 11 ("Plaintiff objects to the Report and its findings related to the "ASCLD Letter" to the extent that the Report concludes that the speech as not causally connected to the adverse employment action.").)  As noted earlier, this objection is insufficient to warrant de novo review.  See W.D. Tex. Assignment of Duties to United States Magistrate Judges Rule 4(b).

Nevertheless, even if this Court were review the matter de novo, the Court finds that the ASCLD Letter was not causally connected to Stephens's termination.  Stephens's Response to Defendants' summary judgment argued that the ASCLD Letter's "close proximity to the termination is enough show

46

causation." (Resp. at 25.)  However, the Court fails to see how the ASCLD Letter—sent on April 20, 2011—could have been a substantial motivating factor in Stephens's termination when APD had already decided to initiate termination proceedings by giving her a pre-termination notice and placing her on administrative leave (by removing her from the premises) nine days earlier on April 11, 2014.  Moreover, the ASCLD Letter was not mentioned in the list of reasons Acevedo provided on Stephens's termination letter.  The Court has searched in vain for any passage wherein anyone in APD cited the ASCLD Letter as a reason—let alone a substantial motivating reason—for Stephens's termination.  The ASCLD Letter is not casually connected to Stephens's termination.

Second, because Stephens does not object to the finding that there is a fact question as to whether the Gallegos Email was causally connected to her termination, the Court reviews the conclusion for clear error.  The Court agrees that the evidence showing that Acevedo's decision to terminate Stephens was based on Mannix's description and opinion of Stephens's conduct—and that Mannix was fully aware of the contents of the Gallegos email.  Therefore, the Court agrees that there remains a fact question as to whether the Gallegos Email is causally connected to Stephens's discharge.

47

D.     <u>Interest in Efficiency</u>

       Unlike the aforementioned objections, Stephens's objection to the Magistrate Judge's finding that APD's interest in efficiency outweighed Stephens's First Amendment interest in her speech is entitled to a de novo review by this Court.  She specifically objects to the Report because "the Report did not address relevant facts and law" and "a fact issue exists as to whether Defendants' interest in efficiency outweighs Plaintiff's interest."  (Obj. at 1.)

       As the Magistrate Judge noted, even if a public employee speaks on a matter of public concern and that speech is casually connected to the adverse employment action, a public employee's speech is not protected unless the employee's interest in expressing him or herself on the matter outweighs the government's interest in promoting the efficiency of its public services.  <u>See</u> <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563, 568 (1968).  To resolve whether the government's interest in efficiency outweighs the employee's First Amendment interests, the court performs a <u>Pickering</u> balancing test, which "in reality is a sliding scale or spectrum upon which 'public concern is weighed against disruption'" to the government's interest in efficient operation.  <u>Vojvodich v. Lopez</u>, 48 F.3d 879, 885 (5th Cir. 1995) (quoting <u>Click v. Copeland</u>, 970 F.2d 106, 112 (5th Cir.1992) (internal quotations omitted)).  For purposes of the <u>Pickering</u> balancing test, "[t]he more central a matter of public concern is to the speech at

issue, the stronger the employer's showing of counter-balancing governmental

interest must be." <u>Coughlin</u>, 946 F.2d at 1157 (citing cases).  The test encompasses

several factors:

> (1) the degree to which the employee's activity involved a matter of public concern; (2) the time, place, and manner of the employee's activity; (3) whether close working relationships are essential to fulfilling the employee's public responsibilities and the potential effect of the employee's activity on those relationships; (4) whether the employee's activity may be characterized as hostile, abusive, or insubordinate; and (5) whether the activity impairs discipline by superiors or harmony among coworkers.

<u>Jordan v. Ector Cnty.</u>, 516 F.3d 290, 299 (5th Cir. 2008).

The Magistrate Judge found that Defendants had submitted significant

evidence of disruption and that Stephens's First Amendment interest in her speech

was outweighed by her disruptive and insubordinate behaviors in the Lab.  (Rep. at

29–32.)  He relied on Stephens numerous confrontations with her supervisor,

Rodriguez, including her emails describing Rodriguez as "evil."  (<u>Id.</u> at 31.)  He

also relied on Stephens's influence on Carrolls's resignation and Stephens's email

discussion about Carrolls's health issues.  (<u>Id.</u>)

Before addressing Stephens's objections, the Court wishes to clarify

the relevant considerations under a <u>Pickering</u> analysis because it appears that

certain parts of the Report and the parties' arguments in support and opposition to

the Report are evaluating Defendants' interest in efficiency in relation to

Stephens's entire disruptive conduct—as opposed evaluating Defendants' interest

in relation to Stephens's protected speech activity.  (See Rep. at 31 (relying on Stephens confronting Rodriguez on more than one occasion accusing her of being evil); id. at 32 (relying on Stephens's disregard for Lab policies).)   The relevant consideration under Pickering examines "how the speech at issue affects the government's interest in providing services efficiently."  Kinney v. Weaver, 367 F.3d 337, 362 (5th Cir. 2004); see also De La Garza v. Brumby, No. 6:11-CV-37, 2013 WL 754260, at *4 (S.D. Tex. Feb. 27, 2013) ("[U]nder the Pickering inquiry, it is the associational or speech activity that must give rise to the workplace disruption.").  As such, Defendants' interest in maintaining a harmonious and efficient workplace must be weighed in relation to Stephens's protected speech activity.

        With that consideration in mind, the Court turns to Stephens's objections.  Stephens argues that the Magistrate Judge erred by concluding that Defendants' interest in the efficient provision of public services outweighed her First Amendment interests.  She contends that Defendants' evidence did not demonstrate a morale issue sufficient to provide a finding that Defendants' interest in efficiency outweighed Stephens's interest in her speech.  She argues that there was no real disruption because (1) Rodriguez found her behaviors to be non-objectionable until the day of Stephens's removal from the Lab's premises, (2) Gibbens was only concerned that the Gallegos Email made the Lab "look bad,"

50

and (3) Stephens was not a supervisor, she did not work closely with any other employee, and her statements were not offensive to any group.  (Obj. at 1–5.) Defendants counter that Rodriguez's assessment does not mitigate the reasonable likelihood of disruption, Stephens is misquoting Gibbens's testimony, and Stephens's lack of supervisory status or non-offensive statements is not dispositive.

       1.   <u>Rodriguez's Testimony</u>

Stephens predominantly argues that the Magistrate Judge did not adequately credit certain testimony by Rodriguez.  According to Stephens, "[t]he Report does not address the fact that Rodriguez, Stephens's direct supervisor, and the one with the most knowledge about the morale of the Lab and its employees, did not believe that the morale in the Lab or any insubordination on the part of Stephens necessitated termination until April 11, 2011"—the day of Stephens's removal from the Lab's premises.  (Obj. at 3.)  Stephens relies on two portions of Rodriguez's deposition testimony.

First, she cites pages 38 through 40, which provide in relevant part:

Q.  And so you didn't make the decision that Ms. Stephens should be terminated until April of 2011, right?

. . . .

A.  I didn't make  -- since I can't make the decision that Ms. Stephens should be terminated, I was asked my opinion of whether or not she should be terminated.  My final opinion on that, yes was in April.

Q.      That's when you formed that opinion, was the day she was
        escorted out of the building?

A.      Yes.

Q.      And so if you were going -- because you were working on a
        corrective action report from Ms. Stephens on April 7, 2011.
        Do you remember doing that?

A.      Without seeing the corrective action report that I was writing, I
        know I was writing -- was in the process of writing one.  I don't
        know the exact date that I was writing it on.

. . . .

Q.      Would you work on drawing up a corrective action report for
        someone who was terminated?

A.      I would have to do a corrective action report whether or not
        somebody was terminated if it reflected case work, yes.

Q.      And so you don't remember what day Ms. Stephens was asked
        to leave?

A.      I know it was the early part of April, but the exact date I don't
        recall anymore.

Q.      And what was the precipitating factor that caused you to change
        your opinion on whatever day she was escorted out of the
        building from her not needed to be terminated to her needing to
        be terminated?

A.      I want to say that it was her insubordination towards me that
        day and in particular what I considered a verbal threat when she
        says "may God have mercy on your soul."

(Rodriguez Dep. 38:19–40:18.)

        Second, Stephens cites pages 165 through 166, wherein Rodriguez

explained that on April 7, 2011, she did not think Stephens should be terminated;

at that point, she was only drafting a reprimand for corrective, as opposed to

disciplinary, action:

> Q.   Okay.  And you still on this day, on April 7, 2011, at 3:33, you
> still had not formed the opinion that Ms. Stephens should be
> terminated, personally, yourself?
>
> A.   Correct.  If I had I wouldn't have gone through the trouble of
> writing the corrective action report or the reprimand.  Why
> write the reprimand if I want her out?  A reprimand means just
> fix the problem and we can go forward.

(Id. 165:18–166:1.)  Based on these two citations to Rodriguez's deposition

testimony, Stephens asserts that because Rodriguez did not find her behavior to

warrant termination, it must not have been sufficiently disruptive to warrant a

finding in favor of Defendants in the Pickering analysis.  (Obj. at 2–3.)  In other

words, Stephens contends that unless—and until—her disruption warranted

termination, it was not disruption worthy of Pickering.

There are two problems with Stephens's argument.  First, it

incorrectly assumes that Stephens's other conduct—conduct prior to sending the

Gallegos Email—is a relevant consideration in the Pickering balancing test.

However, as discussed above, only the protected speech that is causally connected

to the adverse employment action—in this case, the Gallegos Email—gives rise to

workplace disruption.  See Kinney, 367 F.3d at 362.  As such, whether Stephens's

other behaviors were or were not disruptive is irrelevant.  It is only whether the

Gallegos email caused or was reasonably likely to cause disruption.

Second, even accepting Stephens's argument that her previous disruption was insignificant because it did not merit termination, the Magistrate Judge correctly reminded Stephens that "an employer may 'take action before a risk ripens into an actual workplace disruption.'"  (Rep. at 30 (emphasis added) (citing Kinney, 367 F.3d at 364).)  This point is well-established.  See Connick, 461 U.S. at 168 ("[A]n employer need not wait until the destruction of working relationships is manifest before taking action."); accord Salge, 411 F.3d at 192 ("[A]n employer may justifiably discharge an employee on a belief that the employee's speech has caused or will cause significant disruption to the workplace."); U.S. Dep't of Justice, I.N.S., Border Patrol, El Paso, Tex. v. Fed. Labor Relations Auth., 955 F.2d 998, 1007 (5th Cir. 1992) ("[I]t is not necessary 'for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of the working relationship is manifest before taking action.'" (quoting Connick, 461 U.S. at 168)).

Accordingly, Stephens's arguments that the Magistrate Judge improperly overlooked Rodriguez's testimony are unpersuasive.

### 2.   Gibbens's Testimony

Stephens argues that the Magistrate Judge did not address the cited testimony of Gibbens, which allegedly revealed that he was not concerned about morale or insubordination.  (Obj. at 4.)  According to Stephens, Gibbens was only

concerned about the Gallegos Email because "it made the Lab look bad," might incite Gallegos to step "outside of her realm as an auditor," and might prompt Gallegos to "investigate the Lab." (Id.) Presumably, Stephens contends that because Gibbens was only concerned with the effect that the Gallegos might have had on Gallegos in relation to her role as the Lab's auditor, Gibbens did not find any disruption.

However, Stephens's argument rests on a logical fallacy. Just because Gibbens was concerned that the Gallegos Email would prompt Gallegos to step outside her realm as an auditor does not mean that he did not find that the Gallegos Email would not have reasonably led to disruption within the Lab. The two concerns are not mutually exclusive.

3.    Stephens's Lack of Supervisory Power; Statements Were Not Profane or Offensive to Particular Group

Stephens also contends that because she was not a supervisor and her statements were not profane or directed at a particular group, there was no real disruption to merit finding that Defendants' interest in efficiency outweighed her First Amendment interests. (Obj. at 2.)

Defendants correctly point out that Stephens's lack of supervisory status is entitled to little consideration because "if supervisory responsibility were required, the only persons who could ever have First Amendment claims against their employers would be supervisory employees." (Obj. Resp. at 5.) Defendants

55

also correctly highlight that solely because Stephens's comments in the Gallegos email were not profane or racially motivated, that does not mean that that were not offensive on other bases.  (Id. at 7.)

          4.       Assumptions and Conflicting Evidence

Stephens also argues that the Magistrate Judge's Report "agrees with the conclusory statements of Leticia Paredes, head of APD HR" and that "this case should not be dismissed on assumptions." (Obj. at 4.)  Similarly, she asserts that "[w]hile the Defendants maintain that they were concerned about the email's [e]ffect on morale and that Plaintiff was being disruptive, there is conflicting evidence." (Id. at 4–5.)  She relies on Gustafson v. Jones, 290 F.3d 895 (7th Cir. 2002), wherein the Seventh Circuit held that "Pickering balancing is not an exercise in judicial speculation.  While it is true that in some cases the undisputed facts on summary judgment permit the resolution of a claim without a trial, that means only that the Pickering elements are assessed in light of a record free from material factual disputes." (Id. at 5 (quoting Gustafson, 290 F.3d at 909).)

Although presented from a different perspective, this argument merely restates Stephens's previous argument that absent actual proof of disruption in the Lab, Defendants' interest in maintaining a harmonious atmosphere is not substantial enough to outweigh First Amendment interests.  Again, however, this argument misstates the law because an employer can terminate an employee's

employment if that employee's speech was reasonably calculated to cause workplace disruption. <u>See, e.g.</u>, <u>Connick</u>, 461 U.S. at 168; <u>Salge</u>, 411 F.3d at 192; <u>Kinney</u>, 367 F.3d at 364; <u>U.S. Dep't of Justice, I.N.S., Border Patrol, El Paso, Tex.</u>, 955 F.2d at 1007.

      5.    <u>De Novo Review</u>

Irrespective of Stephens's unpersuasive arguments, a de novo review of Defendants' evidence reveals that the protected speech identified in the Gallegos Email was likely to cause workplace disruption such that Defendants' interest in maintaining a harmonious and efficient workplace outweighed Stephens's interests in her speech. The Gallegos Email revealed private, medical information about a co-worker:

> The young chemist who was assigned the breath alcohol duties, resigned under pressure. She became addicted to Xanax and lost so much weight, that she was diagnosed "aneorexic." When she asked to be returned to the drug lab, they wouldn't let her and her husband made her resign in order to rest and regain her health. They destroyed this poor little girl's career!

(Gallegos Email at 1–2.) Mannix cited this portion of the Gallegos Email as the basis of Stephens's termination because it impermissibly "discussed a former employee's medical conditions without the employee's knowledge or permission." (Mannix Decl. ¶ 49.) This Court agrees with the Magistrate Judge that it has "no trouble concluding that Defendants' interest in limiting an employee's speech regarding private health information outweighs any First Amendment protection of

such speech."  (Rep. at 32 (citing <u>Rankin v. McPherson</u>, 483 U.S. 378, 388 (1987)

(including harmony among co-workers as a factor to consider in balancing

employer's interest in workplace efficiency)).)

       The Gallegos Email also disparaged the Lab by describing its

employees as "truly evil" and remarking that "they have destroyed the careers of so

many fine people.  But, truly . . . they don't care."  (Gallegos Email at 2.)  Harris

found these statements in the Gallegos Email to be "insubordinate and improper."

(Harris Decl. ¶ 44.)  The Gallegos Email also mentioned that Stephens requested

that "Brandon" remove the job posting on the SWAFS website.  (Gallegos Email at

3.)  Mannix testified that this statement "interfered and undermined the

Department's recruiting efforts."  Defendants' evidence sufficiently demonstrated

that these statements were likely to bring professionalism of APD and the Lab into

disrepute.  <u>See</u> <u>Nixon</u>, 511 F.3d at 499 (holding that the reputation of a police

department is a legitimate and substantial government concern and thus it was

reasonable for a police department to believe that a police officer's newspaper

columns and the caustic remarks therein would impair the proper performance of

its functions).

       Contrary to Stephens's arguments that disruption did not occur and

was not likely to occur, it is hard to imagine that revealing a fellow employee's

purported addiction to Xanax and anorexia diagnosis as well as describing a law

enforcement agency employer as "evil" could constitute non-disruptive speech.  As such, Defendants' interest in maintaining an efficient, disciplined, and harmonious workforce is high.

The Court weighs this interest against Stephens's First Amendment interests.  In her Response to Defendants' Motion for Summary Judgment, Stephens contended that her statements in the Gallegos Email were "of great interest to the public."  (Resp. at 28.)  She claimed that the misgivings she complained of in the Email had "social value" and should be given "extra protection because of the nature of the wrongdoing alleged."  (Id.)  However, the portions of her email that discuss issues that would be protected—statements about matters of public concern outside of her discussion of internal personnel disputes—are limited in their public value.

In sum, the Court agrees that Defendants' interest in an efficient, harmonious, and disciplined workplace outweighed Stephens's First Amendment interests.  Accordingly, Stephens fails to state a prima facie case for First Amendment retaliation and Defendants are entitled to summary judgment.

III.    Same Employment Action

Defendants argue that, even if Stephens made out a prima facie case for First Amendment retaliation, they would have come to the same conclusion in the absence of the First Amendment-protected conduct.  (Mot. at 34–35.)

59

According to Defendants, they began the disciplinary process in March, prior to the April 7 and April 8 speech at issue.  (Id. at 35.)  Defendants do not cite to the record to support this proposition, but suggest that the evidence is contained in the declaration of Mannix and Paredes.  In support of their argument, Defendants also note that Stephens only challenges two of the seven reasons for termination cited in the termination letter as protected speech.  (Id.)

Stephens contends that neither of her supervisors concluded that termination was appropriate until after the Gallegos Email was sent and that the reasons cited in the termination letter would not have warranted termination without the emails at issue.  (Resp. ¶ 76–78.)  In support of this position, she cites to the testimony of Gibbens and Rodriguez, who state that the other five of the seven reasons for termination would not have warranted termination and that Gibbens and Rodriguez did not form the opinion that Stephens should be terminated until after the Gallegos Email was sent.  (Resp., Ex. 10 at 75:18–75:21; id. at 123:18–125:2; Resp., Ex. 9 at 40:8–40:19; id. at 57:1–57:7.)  Stephens also cites to an email from Burton, which states that APD viewed the Gallegos Email and the Beware Email "to be in violation of APD General Orders and is moving to terminate Ms. Stephens."[2]  (Resp., Ex.7 at 2.)

---

[2] The Court notes that Stephens also cites to Harris's statement that "he was recommending termination, at least in part, because of the Gallegos Email."

Stephens is correct that there is a fact issue as to whether the incidents prior to April 8 would have warranted termination on their own. According to the factual record, Stephens's termination was a result of a series of incidents that followed the institution of her disciplinary probation in late 2010. (Resp., Ex. 6 at 3.) Prior to the speech at issue, Defendants documented five instances of misconduct that followed the probation—all listed in the termination letter, and most of which involved insubordination and unprofessional conduct. (Id.; see also Ex. 12 at 10 (finding an unacceptable level of performance with regard to Customer Service/Professionalism because Stephens "[v]iolated several items outlined in Disciplinary Probation and General Orders: Insubordinate to supervisor, created hostile work environment for co-workers, made disparaging remarks about supervisor and upper management, provided false information about

---

(Resp. at 30 (citing to Resp., Ex. 9 at 138:10–142:25).) As Defendants correctly argue, this statement is hearsay. The precise statement upon which Stephens relies is made by Rodriguez and states: "[Harris] was talking about the e-mail and at the end of the conversation, Mr. Harris said he felt that he – that termination should be what we should be looking at on the long-term after not only just this e-mail, but accumulation of everything that had happened." (Id. at 142:15–142:20.) Stephens offers Rodriguez's statement to prove the truth of the matter asserted therein, i.e., that Harris was recommending termination in part because of the Gallegos email. Under Federal Rule of Civil Procedure 56(c)(2), a party can challenge evidence on the basis that it cannot be presented in a form admissible in evidence. Because this statement is hearsay that does not fall within any exception, see Fed. R. Evid. 801(c), it is inadmissible for summary judgment purposes. See Harris ex rel Harris. v. Pontotoc Cnty. Sch. Dist., 635 F.3d 685, 692 (5th Cir. 2011) ("Hearsay evidence inadmissible at trial cannot be used to create a genuine issue of material fact to avoid summary judgment.").

co-worker").)  In conjunction with the verbal and written reprimands, Defendants

repeatedly warned Stephens that similar conduct in the future would lead to

progressive disciplinary measures up to and including termination.  (Mot., Ex. 3 at

4, 7, 18; id., Ex. 5 at 10.)

        In Paredes's declaration, she states that after the February 2011

incidents, she and management decided that Stephens's "continued violation of the

[SOPs] was significant enough to possibly warrant termination and decided to go

forward with a pre-termination."  (Mot., Ex. 8 at 6.)  She also states that she was

unable to schedule Stephens's disciplinary hearing in March because Mannix was

out of the office for a week, and Acevedo was out of the office the following week.

(Id. at 7.)  She finally notes that the Department preferred to have Acevedo in town

"when we have disciplinary issues that could result in termination so that he could

be appropriately briefed."  (Id.)  Similarly, in describing the events, Mannix's

declaration states: "Because it was possible that Ms. Stephens' conduct would be

serious enough to warrant termination, I wanted Chief Acevedo to be available on

the date of any disciplinary meeting."  (Mot., Ex. 7 at 12.)  While this evidence

establishes that there was a possibility that Stephens's termination could have

occurred irrespective of the April 8 emails, it is not conclusive on the point.  As the

Fifth Circuit has stated with regard to demotion in this context, "the issue is not

whether [the plaintiff] could have been demoted . . . but whether he would have

62

been demoted if he had not engaged in protected speech." <u>Haverda</u>, 723 F.3d at
597.

However, this question is nevertheless inappropriate for the jury
because Stephens failed to make out her prima facie case with regard to the
protected speech at issue.  The reasons in the termination letter related to the
protected speech are (1) that Stephens revealed a former employee's
pharmaceutical addiction and eating disorder without that employee's knowledge
or permission in the Gallegos Email; (2) that Stephens asked that a SWAFS
representative remove a job posting, which undermined the Department's
recruiting efforts, in the DPS Email; and (3) that Stephens's distribution of the
Beware Email on April 8 was disparaging to her chain of command and the
Department.  (Resp., Ex. 6 at 3.)  The Court has found that neither the DPS Email
nor the Beware Email constitute protected speech.  Moreover, although parts of the
Gallegos email constitute protected speech, the Court has found that the
Defendants' interest in efficiency outweighs Stephens's interest in speech, and so
Stephens has not made out her prima facie case.  Accordingly, the question as to
whether Defendants have made out their burden to show that the same employment
action would have occurred in absence of the speech at issue is irrelevant.
Similarly, although the Court granted discovery on pretext in the interests of
justice, evaluating pretext in this case puts the cart before the horse.  Without a

prima facie showing that Defendants engaged in First Amendment retaliation, the question of pretext is irrelevant.

IV.   <u>Qualified Immunity</u>

Stephens makes a general, non-specific objection to the Magistrate Judge's finding that Acevedo is entitled to qualified immunity.  This is insufficient to warrant de novo review.  <u>See</u> W.D. Tex. Assignment of Duties to United States Magistrate Judges Rule 4(b).  Nevertheless, the Court briefly reviews the merits of her objection.

To withstand the qualified immunity defense, Stephens must demonstrate that there was a violation of clearly established constitutional right. <u>Pearson v. Callahan</u>, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009). Finding no violation of a constitutional right, as described above, the Court finds that Acevedo would be immune from the First Amendment claims made against him in his individual capacity.

V.   <u>Punitive Damages</u>

Finally, Stephens makes a non-specific objection to the Magistrate Judge's finding that Stephens is not entitled to punitive damages.  Again, although the Court is not obligated, it briefly reviews the merits of the objection.  <u>See</u> W.D. Tex. Assignment of Duties to United States Magistrate Judges Rule 4(b).

To receive punitive damages on a Section 1983 claim, a plaintiff must show that the defendant's conduct was "'motivated by evil intent' or demonstrate[d] 'reckless or callous indifference' to a person's constitutional rights." Williams v. Kaufman Cnty., 352 F.3d 994, 1015 (5th Cir. 2003) (emphasis omitted) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)). As discussed above, Stephens has not made out a constitutional violation. Therefore, punitive damages are unwarranted in this case.

### CONCLUSION

For the aforementioned reasons, the Court **DENIES** Stephens's Objections and **ADOPTS** the Magistrate Judge's Report and Recommendation, insofar as it finds that Plaintiff has failed to make out her prima facie case. The Court **VACATES** the Magistrate Judge's Report and Recommendation as to its findings that Defendants would have engaged in the same employment action in the absence of the First Amendment protected conduct and that Plaintiff failed to make a showing that the non-First Amendment reasons for that action were pretext, since the Court does not reach the questions.

**IT IS SO ORDERED.**

**DATED**: Austin, Texas, September 30, 2014.

_____
David Alan Ezra
Senior United States Distict Judge